UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| KEISHA TAYLOR, <br>     **Plaintiff,** <br><br> V. <br><br> PINE MEADOWS HEALTHCARE, LLC, <br>     **Defendant.** | CIVIL ACTION NO. 5:12-CV-175 <br><br> **MEMORANDUM, OPINION, AND ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendant Pine Meadows Health Care, LLC's motion for summary judgment. (DE 19). For the reasons discussed below, the Court will grant Pine Meadows' motion.

## I. Factual Background

This case is brought by Plaintiff Keisha Taylor against her former employer Defendant Pine Meadows for terminating Taylor in violation of the Family Medical Leave Act ("FMLA"). The facts of this case are a twisted sequence of events revolving around whether Taylor complied with the TB skin testing[1] requirements of Pine Meadows and Taylor's behavior surrounding the investigation of the TB skin test. While the parties disagree at length about whether Taylor actually took her TB skin test, as explained later in this Order, such discrepancies are of no legal significance. For ease of understanding, the Court will describe Pine Meadows' version of events, which are heavily supported by all the evidence presented, including much of Taylor's own testimony. Next, the Court will

---

[1] The TB skin test is also referred to by the parties and in this Order as a "PPD test."

highlight the discrepancies in Taylor's version of events. Finally, the case involves a large network of individuals who are listed for convenience below.

| Name of Individual | Brief Description |
|---|---|
| Keisha Taylor | Plaintiff and former State Registered Nursing Assistant ("SRNA") at Pine Meadows. |
| Pine Meadows | Defendant nursing home with more than fifty employees, subject to the FMLA |
| Chestina Janisewska ("C.J.") | Employee at Pine Meadows who was responsible for the staff development and tracking employee immunizations. |
| "Taylor's Uncle" | A nurse at Pine Meadows who is also Taylor's uncle. |
| Traci Griffin | The house supervisor at Pine Meadows. |
| Yolanda Loveless | Director of Nursing at Pine Meadows. |
| Chad Helton | Facility Administrator at Pine Meadows |

### A. Pine Meadows' Version of Events

First, Pine Meadows provides the following reasons for termination:

> Taylor's persistent *obstruction*, *belligerence*, and *refusal to cooperate* in the efforts of Chestina Janiszewska [C.J] to document that Taylor had been administered and passed the state mandated TB skin test. Taylor's *obstruction* including claiming the test was administered by Dewayne Taylor, then when that claim proved to be false, falsely claiming that it was administered by Traci Griffin . . . [While on the phone with C.J.] Taylor became belligerent and *insubordinate*. Taylor's conduct violated a number of Pine Meadows' work rules and exposed the facility to possible violation of government regulation.

(DE 19-7) (emphasis added).

The relevant events began when C.J., who was responsible for staff development at Pine Meadows, contacted Taylor sometime in August or September to alert Taylor that her annual PPD test was due. (DE 19-3, 19-10). Later in September, C.J. again approached Taylor to inform her that she was overdue for her annual PPD test. (DE 19-3). According to C.J., Taylor insisted that Taylor's uncle, a nurse at Pine Meadows, had given her the PPD test. (DE 19-10). C.J. questioned Taylor's uncle, but Taylor's uncle denied giving the PPD test. (DE 19-3). C.J. reports questioning Taylor more than twice about the overdue

2

PPD test. (DE 19-3). When C.J.'s efforts failed, she asked Griffin to question the facility nurses about whether any of them had given an employee a PPD test. (DE 19-3). Griffin reported that no nurse could recall giving a PPD test. (DE 19-3).

Some months later, on December 19th, Taylor called Pine Meadows to inform them that she had seen a doctor and she could not work for the next two weekends. (DE 19-1). Loveless, the Director of Nursing, told Taylor she would need to fill out FMLA paperwork. (DE 19-1).

According to C.J. and Loveless, C.J. did not report the overdue TB skin test to Loveless, until December 20, 2013, one day after Taylor had taken medical leave. (DE 19-3, 19-4). Taylor was brought up in a conversation between C.J. and Loveless on the 20th, because the two were discussing the holiday schedule and Taylor was now unable to work. (DE 19-4). Based on Taylor's report to C.J. that Taylor's uncle had given Taylor the PPD test, Loveless wrote a note to Taylor's uncle to determine if he had administered the test and if so, what the results were. (DE 19-4, 19-5). It is undisputed that Taylor's uncle responded in writing, "I don't remember giving her [Taylor] PPD [test]." (DE 19-5). Based on this report, Loveless then spoke with the Facility Administrator, Chad Helton, to determine a course of action. (DE 19-4). The two decided not to ask Taylor about the test until after she was off medical leave. (19-4).[2] Meanwhile, Taylor's uncle told her that Loveless and/or C.J. had questioned him about Taylor's PPD test. (DE 19-10).

At this point, to the knowledge of Loveless, Helton, C.J., and Pine Meadows generally, the mater of Taylor's PPD test would not be addressed until after Taylor was off FMLA leave. However, Taylor admits to calling several times to ask about the PPD test

---

[2] Taylor does not put forth any facts to dispute this testimony, except to say that Loveless must have known about the PPD test prior to December 20, 2013, because Taylor's typed notes, written after she was terminated, indicate that Loveless asked her about the PPD test on the 19th. However, Taylor testified that on December 19th she and Loveless only discussed the need for Taylor to file FMLA paperwork, not anything concerning the PPD test.

while she was on FMLA leave. (DE 19-2). According to Loveless, when Loveless spoke to Taylor, Taylor was screaming and acting "belligerent." (DE 19-4). According to C.J., Taylor was "less than professional . . . she was cursing [and] [s]he was yelling." (DE 19-3). Loveless and/or C.J. explained to Taylor that Griffin denied administering Taylor's PPD test, which admittedly made Taylor "angry." (DE 19-10). Taylor also concedes that she "raised her voice" to C.J. because C.J. "kept trying to say that I [Taylor] was lying." (DE 19-10). Of course, to the knowledge of Loveless, C.J., and Helton, neither Taylor's uncle, nor Griffin had given Taylor the PPD test.

On January 6th Loveless again met with Helton, and based on the belief that Taylor was lying, her obstruction in determining who, if anyone, had given her the PPD test, her uncooperativeness and belligerence with her superiors, and her failure to comply with PPD testing and documentation requirements, Loveless and Helton decided to terminate Taylor. (DE 19-1, 19-4, 19-7). The same day, Loveless called Taylor and terminated her employment over the phone.[3] (DE 19-4, 19-10). It is undisputed that Taylor then texted Griffin, "Thanks for getting me fired." (DE 19-10).

On May 25, 2012, Taylor filed a complaint against Pine Meadows asserting that Pine Meadows terminated her in retaliation for taking medical leave, which is prohibited under the FMLA. (DE 1).[4] Taylor also asserts a Kentucky state law claim, alleging that Pine Meadows' violations of the FMLA are against the public policy of Kentucky. As a result, Pine Meadows moved for summary judgment.

---

[3] Notably, Taylor lived some two and a half hours from Pine Meadows, and Loveless testified that she did not want to ask Taylor to drive the distance to speak in person. (DE 19-4).
[4] Taylor admits, aside from the lengthy time between C.J.'s original investigation of the TB skin test and when Taylor was fired she has no other reason for believing she was terminated in retaliation for taking FMLA leave. (DE 19-2) ("Any other basis you have for believing that was the reason [the lengthy time period] you were let go?" Taylor responded, "No. That's it. That's the reason.").

4

### A. Taylor's Discrepancies

- When C.J. questioned Taylor about the TB skin test in August or September, Taylor told C.J. that Griffin had administered the test and her uncle read the results.[5]
- Taylor insists that no discussions about the overdue PPD test occurred from initial discussions in September until December when the matter resurfaced. (DE 19-10).[6]
- On December 19th, when Taylor contacted Loveless to tell her she would be off work, Loveless commented about "the fact that she kept calling Defendant to ask about her schedule, specifically the holiday schedule." (DE 21, p. 3). According to Taylor, Loveless also inquired about the TB skin test, which Taylor told Loveless was performed by Griffin and read by her uncle. (DE 21, p. 3).
- At some point later, Taylor attempted to call Loveless and left a message that she would retake the TB skin test and make sure the paperwork was done correctly.
- On January 6, Loveless returned her call and terminated Taylor, indicating that she was being fired for "having lied about the TB test." (DE 21, p.4).
- Taylor contends that she was terminated in retaliation for taking medical leave in violation of the FMLA. (DE 1).

### II. Analysis

### A. Standard of Review

"Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); Fed. R. Civ. P. 56. "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989). Finally to the extent any relevant facts do conflict, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

---

[5] A TB skin test is administered by giving a small injection in an individual's arm, just under the skin. After forty-eight to seventy-two hours, the test is read to determine whether the reaction is a positive or negative. Thus, it is possible that one person administers the test and another person reads and records the result.

[6] Pine Meadows does not provide any evidence to refute Taylor's claim. C.J. indicated that she could not recall whether she had questioned Taylor about the PPD test in October or November. (DE 19-3).

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. FMLA Retaliation Claim (Count I)

The issue here is whether Taylor has shown Pine Meadows' proffered reasons for termination were a pretext for unlawful discrimination. For purposes of its motion, Pine Meadows concedes that Taylor can establish a prima facie claim of retaliation under FMLA. (DE 19-1). Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff establishes a prima facie case for retaliation, the burden shifts to the employer to present a legitimate, non-retaliatory reason for terminating the plaintiff. *Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 284 (6th Cir. 2012). Pine Meadows has asserted legitimate reasons for terminating Taylor, including:

> Taylor's persistent *obstruction*, *belligerence*, and *refusal to cooperate* in the efforts of Chestina Janiszewska [C.J] to document that Taylor had been administered and passed the state mandated TB skin test. Taylor's *obstruction* including claiming the test was administered by Dewayne Taylor, then when that claim proved to be false, falsely claiming that it was administered by Traci Griffin . . . [While on the phone with C.J.] Taylor became belligerent and *insubordinate*. Taylor's conduct violated a number of Pine Meadows' work rules and exposed the facility to possible violation of government regulation.

(DE 19-7) (emphasis added). As a result, the burden shifts back to Taylor to show that these reasons are a pretext for unlawful retaliation. *See Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir. 2007). "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not *actually* motivate the action; or (3) were *insufficient* to warrant the action." *Seeger*, 681 F.3d at 285 (emphasis added) (citing *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000)).

Taylor cannot meet that burden here. In Taylor's response in opposition to Pine Meadows' motion for summary judgment, she asserts the final two showings of pretext; that

is, the proffered reasons for termination did not actually motivate the action, and the proffered reasons were insufficient to warrant the action. Taylor does not assert that Pine Meadows' proffered reasons have no basis in fact.

"With electing to show pretext under the 'actual motivation' option, Plaintiff is arguing that 'the sheer weight of the circumstantial evidence of discrimination make it more likely that [sic] not that the employer's explanation is a pretext, coverup.'" *Laws v. HealthSouth N. Ky. Rehabilitation Hosp. Ltd.*, 828 F. Supp.2d 889, 922 (E.D. Ky. 2011) (internal citations omitted). In the instant case, Taylor insists that Pine Meadows has given different reasons for termination, and therefore, those reasons must be a coverup for the *actual* reason for Taylor's termination. (DE 21). Taylor's argument is without merit. Taylor's personal notes,[7] which she insists are an accurate depiction of the events, indicate that Loveless told Taylor she was being terminated for lying about having the PPD test. (DE 19-10). Loveless testified that she and Helton decided to terminate Taylor because they could not "employee [sic] an employee who is belligerent, uncooperative, evading, you know, what the regulations are." (DE 19-4). The interrogatory given to Pine Meadows provides a similar rationale for the discharge of Taylor, including reasons such as her "belligerence . . . and refusal to cooperate" with C.J., as well as Taylor "falsely claiming" that Taylor's uncle and Griffin administered the PPD test. (DE 19-7). These rationales for termination are entirely consistent, and all include an element of Taylor's deceit and obstruction of the truth. Even if Loveless only stated one of several reasons for termination during the phone conversation when Taylor was terminated, Loveless's assertion that Taylor was lying is consistent with the additional reasons provided in the depositions and

---

[7] Taylor testified that after she was terminated, she prepared handwritten notes about what happened leading up to her dismissal. She then typed the notes at some undisclosed time thereafter. The typed version of her notes is submitted with her testimony. DE (19-10).

in the interrogatory. Each of the stated reasons for termination is closely related, and has a strong basis in the evidence presented.

Taylor appears to argue that because she reportedly offered to take another TB skin test, being uncooperative was not Pine Meadow's *actual* reason for termination, this argument also fails. To the knowledge of Loveless and Helton, who were responsible for Taylor's dismissal, both staff members who Taylor had insisted administered the PPD test reported that they had not given Taylor's PPD test. (DE 19-4, 19-5). Thus, Pine Meadows' reports of uncooperativeness stemmed not just from Taylor's failure to take the test, but also from her failure to verify that she took the test, provide an individual to confirm that she took the test, or at least not falsely identify the test administrator, and/or admit that she had not taken the test. Even if Taylor's cooperativeness in offering to retake the test is taken as true, it does nothing to contradict the extensive evidence of her previous lack of cooperation, and therefore, fails to show that Pine Meadows' proffered reason for discharge of uncooperativeness is a pretext "coverup." *See Laws*, 828 F. Supp.2d at 922 (noting that to prove pretext by arguing that a proffered reason is not the *actual* reason for termination, a plaintiff must provide circumstantial evidence that the reason is a coverup).

Taylor also contends that Pine Meadows' proffered reasons were not *sufficient* to warrant the action. "Ordinarily, a plaintiff shows pretext in this manner by demonstrating that non-protected employees were not terminated even though they were engaged in substantially similar conduct." *Henry v. Delta Airlines, Inc.*, No. 2:10-cv-00009-WOB-JGW 2011 WL 3444089 (E.D. Ky. 2011) (citing *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008)). Taylor simply has not shown any evidence that other similarly situated employees were treated differently. Taylor insists that since C.J. has had to remind others to take their PPD test, those employees are similarly situated, but C.J. testified that she had never encountered this type of noncompliance with the TB skin test and documentation

policy. (DE 19-3). Furthermore, Taylor was terminated not just because she had not taken and documented the TB skin test, but because there were reports of belligerent phone calls and reports of lying about who had administered Taylor's PPD test. Additionally, the change in Pine Meadows' policy that now requires C.J. to report any noncompliant employee at the end of his or her overdue month demonstrates the importance of the timeliness of PPD testing and the documentation requirement. (DE 19-3).

Aside from her own testimony, Taylor has not presented any evidence to show that she was not telling the truth about taking the PPD test. She did not submit an affidavit or deposition to contradict the note that Taylor's uncle wrote, confirming that he did not give or read Taylor's PPD test. (DE 19-5). Taylor also admits being told that Griffin also denied ever administering the PPD test, but did not present any evidence to contradict Griffin's statement. (DE 19-10). Thus, Taylor cannot rebut Pine Meadows' evidence that Taylor did not take the PPD test or at least did not document the test properly, lied about who had given her the test, admittedly raised her voice during phone calls with her superiors several times, and acted in a "belligerent" and obstructive manner during those phone calls. Such behavior violates numerous Pine Meadows policies (DE 19-8). Thus, Taylor has presented no evidence that other employees, violating such policies, were treated differently because she has produced no evidence of other employees exhibiting similar behavior.

Taylor's own actions after she was terminated and her testimony during her deposition strongly support Pine Meadows' rationales for termination and moreover, that Taylor *did not believe* that she was fired in retaliation for taking FMLA leave. After Pine Meadows discharged Taylor, she texted Griffin, "Thanks for getting me fired." (DE 19-10). This statement demonstrates that Taylor did not believe she was fired for taking FMLA leave, and instead, believed Pine Meadows' rationale for discharge was her failure to comply with the PPD test policy, obstruction and belligerence, and *lying* about taking the

9

PPD test and who administered it. In her deposition, Taylor also conceded that her only basis for believing that she was fired in retaliation for taking medical leave is the timing of her termination and that there was no discussion about the PPD test until December, several months after the test was overdue. "Unlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'" *Seeger*, 681 F.3d at 285. The plaintiff always bears the burden of providing sufficient evidence for a jury to reject the employer's proffered reasons for termination. *Id.* The timing of termination is alone insufficient. *Id.* Further, the gap in time from when the PPD test was overdue, and when it resurfaced in conversations in December only goes to the issue of Taylor's noncompliance with the PPD test policy. It has nothing to do with Pine Meadows' *additional* reasons for termination, including believing that Taylor lied, obstructed the investigation, and became belligerent with superiors while on medical leave. Thus, even if the time lapse in discussion about the PPD test could prove that the overdue PPD test was not the *actual* reason for termination as Taylor suggests, it does nothing to contradict the *additional* reasons for termination given by Pine Meadows.

Next, Taylor contends that there is a factual dispute about when Loveless knew that Taylor had not taken and/or documented her PPD test. Taylor insists that her notes indicate that Loveless knew about the tardiness of the test at least by December 19th, when Taylor called to report medical leave. In contrast, Loveless testified that she found out for the first time on December 20th. (DE 19-10). However, Taylor testified in her deposition that she called on December 19th to tell Pine Meadows she would be out for two weekends, and Loveless told her she would need to pick up FMLA paperwork. (DE 19-10). When asked, "Anything else you can recall about that conversation with Yolanda [Loveless] on December 19th?," Taylor answered, "No, not that I recall, not that date." (DE 19-10). Thus, Taylor's own testimony contradicts her typed notes which suggest that Loveless inquired

about the PPD test on December 19th. Further, it is unclear why Loveless would bring up the need for Taylor to fill out FMLA paperwork if her underlying motive was to bring up the PPD test and use it as a pretext to start the process of terminating Taylor.

Further, "not every issue of fact or conflicting inference presents *a genuine issue of material fact.*" *Street*, 886 F.2d at 1477. Whether Loveless knew about the overdue PPD test on the December 19th or the 20th is immaterial, because Taylor presents no evidence that Loveless learned about the PPD test well before Taylor took medical leave, which could indicate that noncompliance was insufficient or an unlikely grounds for termination. Moreover, while Loveless was concerned about Taylor's tardy PPD test, it was Taylor's own belligerence and dishonesty that led to Taylor's ultimate dismissal. (DE 19-4). After all, before Taylor began making belligerent phone calls in late December, Loveless testified that, "we [Loveless and Helton] were going to wait until she [Taylor] was off FMLA, so I could ask her about it [the PPD test]." (DE 19-4). Thus, there is every indication that Taylor's belligerent behavior and perceived dishonesty during phone conversations with Loveless and C.J. tipped the scales towards termination.

Taylor's final contention is that "Defendant offers no evidence that Taylor actually was afflicted with tuberculosis or was a health risk to the facility." (DE 21). However, this is irrelevant to the matter of summary judgment and is not in dispute. Pine Meadows has never alleged that Taylor was a health risk or that she had tuberculosis. To the extent Taylor is arguing that the failure to comply with PPD testing is alone insufficient grounds for termination, again, Pine Meadows asserts several *additional* reasons for termination, not just noncompliance with the PPD test policy. Finally, to the extent that Taylor's noncompliance with the PPD test policy is one of several proffered reasons given by her employer, the Pine Meadows Handbook clearly indicates, "skin testing . . . for tuberculosis may be performed on staff members as *a condition of employment* . . . Each employee must

*accept the responsibility of keeping his or her examination and skin test records up to date on an annual basis*." (DE 19-8) (emphasis added). Thus, the absence of a current PPD test, *record* of the PPD test, or both would be sufficient grounds for termination. Here, it is certainly not the sole, or even primary, reason for termination.

Therefore, Taylor has failed to provide any evidence to suggest that Pine Meadows' proffered reasons for termination were merely a pretext for her discharge. Accordingly, summary judgment in favor of Pine Meadows is appropriate.

### C. State Law Claim for Wrongful Discharge (Count II)

In Count II, Taylor alleges a state law claim for wrongful discharge in violation of public policy, but her claim fails as a matter of law. Under Kentucky law and the "terminable-at-will" doctrine, ordinarily "an employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983). In *Firestone*, the Kentucky Supreme Court provided an exception to the "terminable-at- will" doctrine, holding that an employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by a constitutional or statutory provision. *Id*. "This public policy exception has been found not to apply to public policy enunciated in federal law." *Clark v. Sanofi-Synthelabo, Inc.*, 489 F. Supp. 2d 759, 771 (W.D. Ky. 2007) (citing several Kentucky cases); *Shrout v. The TFE Group*, 161 S.W.3d 351, 355 (Ky. App. 2005). In this case, Taylor cites FMLA as the only statutory basis for her claim. Because this federal statute is not a proper basis for such a claim, Pine Meadows is entitled to summary judgment on Count II.

### III. Conclusion

Accordingly, for the above stated reasons, the Court **HEREBY ORDERS** that Defendant's motion for summary judgment (DE 19) is **GRANTED**.

This 20th day of March, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY